UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CAROL KLISKEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 22-cv-40123-MRG |
| | ) | |
| MAKING OPPORTUNITY COUNT, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

**GUZMAN, J.**

Plaintiff Carol Kliskey ("Kliskey") brings this action against her former employer, Defendant Making Opportunity Count, Inc. ("MOC"), for violations of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148; the Massachusetts Earned Sick Time Law ("MEST"), Mass. Gen. Laws ch. 149, § 148C; the Massachusetts Paid Family and Medical Leave Act ("PFML"), Mass. Gen. Laws ch. 175M, § 9; and the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. Kliskey alleges that MOC failed to pay her accrued sick time during her FMLA leave and ultimately terminated her employment in retaliation for exercising her rights under these statutes.

Pending before the Court is MOC's Motion for Summary Judgment [ECF No. 40]. Kliskey has withdrawn her claims under the Massachusetts Wage Act (Counts I and II). [ECF No. 51 at 2]. For the foregoing reasons, MOC's Motion for Summary Judgment is **GRANTED**.

**I.   Background**

Defendant filed a Statement of Material Facts [ECF No. 42 ("SOMF")] pursuant to Local Rule 56.1 that accompanied its motion for summary judgment. Plaintiff filed an opposition in

1

which it disputed some of the stated material facts and also asserted additional material facts. [ECF No. 51-1].[1] The following facts are drawn from the parties' statements of material facts and responses.[2] The Court will address any factual disputes, as well as their materiality, later in the opinion.

MOC is a private, nonprofit corporation, established under the federal Economic Opportunity Act of 1964 for the primary purpose of promoting the well-being of low-income people in the North Central Massachusetts region. [SOMF ¶ 1]. Plaintiff began working for MOC as a program assistant in or around 2003 and worked there for approximately 17.5 years. [Id. ¶ 2; SAMF ¶ 27]. Prior to the events giving rise to this lawsuit, Plaintiff received positive employment reviews and was being trained to take over her manager's position. [SAMF ¶ 29]. Plaintiff intended to work for MOC until she was 70 years old or beyond. [Id. ¶ 28].

As a program assistant, Plaintiff reported to MOC's Gardner, Barre, Winchendon, Fitchburg, and Leominster offices. [SOMF ¶ 3]. She was primarily responsible for ensuring that nutritionists had the supplies they needed, overseeing the front desk, conducting intake to determine client eligibility, giving referrals, and keeping track of records across three offices. [Id.]. During her final year of employment with MOC, Claritza Soto served as Plaintiff's direct supervisor. [Id. ¶ 4; Pl. Resp. SOMF ¶ 4]. Plaintiff was also supervised by Ms. Soto's supervisor, Breana Buckley (now Breana Dalbon). [Pl. Resp. SOMF ¶ 4].

On March 14, 2022, Plaintiff's daughter, Samantha Johnson, attempted suicide. [SAMF ¶ 39]. Plaintiff flew to Oklahoma on March 15, 2022, to care for her daughter. [SOMF ¶ 7; SAMF ¶ 40]. During this time, MOC staff was working remotely. [SAMF ¶ 41]. The Plaintiff worked

---

[1] For ease of reference, the Court will refer to Plaintiff's Responses to the SOMF as "Pl. Resp. SOMF," and to Plaintiff's Statement of Additional Material Facts as "SAMF."
[2] Fed. R. Civ. P. 56(c) allows Courts to consider both material cited and "other materials in the record." Therefore, when necessary, the Court will rely upon materials in the record to supplement the factual background.

remotely from Oklahoma for three days with the permission of Ms. Soto, until Ms. Dalbon stated that she could not. [Id. ¶ 42]. Between March 15 and April 1, 2022, Plaintiff used paid sick leave. [SAMF ¶ 43; Pl. Resp. SOMF ¶ 13]. On March 28, 2022, Plaintiff completed and returned an FMLA leave form, accompanied by a physician's certification. [SOMF ¶ 8; Pl. Resp. SOMF ¶ 8]. On the form, Plaintiff stated, "I will need leave until my daughter's mental health stabilizes." [SOMF ¶ 8]. The certification stated that continuous leave would be required beginning on March 14, 2022, followed by a period of intermittent leave, 1-2 days per week, through March 24, 2023. [Pl. Resp. SOMF ¶ 8]. Plaintiff requested an unknown period of continuous leave, followed by a period of intermittent leave, and requested that on days when she was not utilizing FMLA intermittent leave, she be allowed to work from home. [Id.]. MOC approved Plaintiff's request to take 12 weeks of FMLA leave. [SOMF ¶ 9]. On April 6, 2022, MOC informed Plaintiff that it understood her doctor's certification constituted a request for 3 months of continuous leave and reminded her that she could not work while on leave. [Id. ¶ 12]. Ms. Soto told Plaintiff that she would be filling out Plaintiff's timecard during her FMLA leave and "not to worry about it." [SAMF ¶ 48].

MOC has a policy requiring employees to draw down their accrued sick and/or vacation leave balances while on FMLA leave, which states:

> Unless otherwise prohibited by law, employees will be required to utilize all available paid time off benefits (sick time or vacation time) prior to taking unpaid leave in accordance with applicable policy, and they will receive pay until available benefit time is exhausted; this paid leave runs concurrently with FMLA.

[Id. ¶ 46]. Consistent with this policy, Plaintiff elected to use accrued sick leave to cover her FMLA leave. [Id. ¶ 47]. As of March 29, 2022, Plaintiff had 950.57 hours of accrued paid sick leave and 111.45 hours of accrued paid vacation leave. [Id. ¶ 45]. On April 29, 2022, Plaintiff sought to

3

request benefits under Massachusetts Paid Family Leave ("PFML"). [Id. ¶ 49]. MOC contends that Plaintiff failed to complete her PFML application. [ECF No. 57 at 3; ECF No. 51-5 at 163, 167].

On June 17, 2022, Plaintiff returned to Massachusetts and met with Ms. Soto at MOC. [SAMF ¶ 52]. The parties dispute what transpired during a meeting with Ms. Soto on that date. It is undisputed that Plaintiff told MOC that she was unable to return to work at the conclusion of her leave. [SOMF ¶ 15; Pl. Resp. SOMF ¶ 15]. According to Plaintiff, Ms. Soto denied her request to use extended sick leave and stated that Plaintiff would not be allowed to take any more time off. [SAMF ¶ 52]. Plaintiff also alleges that Ms. Soto gave her an ultimatum to either return to work on July 1, 2022, or be terminated, and that if she was terminated and did not elect to resign in lieu of termination, she would be excluded from future employment with MOC and any of the agencies that it services. [Pl. Resp. SOMF ¶ 18].

According to Plaintiff, during this meeting, Ms. Soto also told her to make sure she was getting paid. [SAMF ¶ 55]. Plaintiff checked her bank account a few days later when she returned to Oklahoma and realized she had not been paid during her FMLA leave. [Id. ¶ 56]. The parties dispute whether Plaintiff then called Ms. Soto later to explain that she had not been paid and that human resources would not tell her why, and whether Ms. Soto told Plaintiff that the reason she had not been paid during her FMLA leave was that she had been fired. [Id. ¶ 57]. The parties also dispute whether MOC terminated Plaintiff's health benefits on June 27, 2022, during her FMLA leave. [Id. ¶ 58; Pl. Resp. SOMF ¶ 21]. Although it is undisputed that Plaintiff failed to pay any premium payments during her leave of absence, MOC contends that it did not cancel Plaintiff's health insurance during her leave. [SOMF ¶ 21; Pl. Resp. SOMF ¶ 21].

On June 30, 2022, Plaintiff submitted a resignation letter, in which she stated that "[a]fter careful consideration, I have made the decision to resign" effective June 30, 2022. [SOMF ¶ 17].

4

In this letter, Plaintiff stated that working for MOC has been a "wonderful experience" and a "sincere pleasure," but that she needs a "couple more months" to be with her daughter and will "check back with [MOC] to see if there [are] any openings" upon her return. [Id.]. The parties dispute whether this resignation was processed. [Pl. Resp. SOMF ¶ 17].

MOC contends that Plaintiff was paid her accrued but unused vacation time on the next regularly scheduled payroll date following her resignation. [SOMF ¶ 19]. Plaintiff disputes this, asserting that her vacation time did not accrue during her FMLA leave from April 2, 2022, to July 2, 2022, and thus she was paid less accrued vacation time than she was owed. [Pl. Resp. SOMF ¶ 19. Plaintiff also alleges that MOC attempted to issue payment to her for sick leave during the period of her FMLA on September 17, 2022, "thereby admitting that its failure to pay sick leave was improper." [Id.].

Plaintiff repeatedly asked Ms. Soto and members of MOC's human resources department to provide her with a termination letter, or at least identify the date she was terminated. [SAMF ¶ 59]. According to Plaintiff, MOC did not deny terminating her in any of its responses to her communications. [Id. ¶ 60]. On September 15, 2022, counsel for the Plaintiff requested her personnel file from MOC. [Id. ¶ 61]. Four months after her separation from MOC, on October 17, 2022, Plaintiff asked Ms. Soto to write a reference letter for her. [SOMF ¶ 24]. Ms. Soto agreed and, in her recommendation letter, stated that she "wouldn't hesitate to hire [Plaintiff] again." [Id.].

## II. Legal Standard

A motion for summary judgment under Fed. R. Civ. P. 56 will be granted "if the movant shows that there is no genuine dispute as to any material fact" such that the moving party is entitled to judgment as a matter of law. A movant must show that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The

burden shifts "to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (collecting cases). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

Issues are "genuine" when they require resolution from a finder of fact "because they may reasonably be resolved in favor of either party." Id. at 250. In other words, there must be "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing version of the truth at trial." Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). The "material" aspect of a summary judgment motion requires that a fact affect the outcome of the case. Garside, 895 F.2d at 48 (quoting Anderson, 477 U.S. at 248). Material issues are ones that "need to be resolved before the related legal issues can be decided." Mack v. Great Atl. & Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989) (citing Greenberg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 934 (1st Cir. 1987)). In analyzing motions for summary judgment, all reasonable inferences are drawn in favor of the nonmoving party. Gattineri v. Wynn MA, LLC, 63 F.4th 71, 85 (1st Cir. 2023) (quoting Doe v. Tr. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)). Parties may not rely on "conclusory allegations or substantiated denials" and must take facts "derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997) (citing Fed. R. Civ. P. 56(c) & (e)).

"Local Rule 56.1 was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of determining whether the disputed issues are material." Butters v. Wells Fargo Advisors, LLC, No.

6

10-10072-MLW, 2012 WL 5959986, at *1 (D. Mass. Nov. 27, 2012) (quoting Brown v. Armstrong, 957 F. Supp. 1293, 1297 (D. Mass. 1997), aff'd, 129 F.3d 1252 (1st Cir. 1997)). The non-moving party must state the specific facts that are disputed which prevent the granting of summary judgment. Brown, 957 F. Supp. at 1297 (citing Vasapolli v. Rostoff, 864 F. Supp. 215, 218 (D. Mass. 1993), aff'd, 39 F.3d 27 (1st Cir. 1994)). The nonmovant must "go beyond merely asserting the existence of a disputed and material fact[,]" and produce evidence that "substantially proves the existence of such a disputed fact." Lucia v. Prospect St. High Income Portfolio, Inc., No. 90-10781-MA, 1993 WL 761409, at *5 (D. Mass. Aug. 26, 1993) (citing Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991)).

In any event, if there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,]" the Court will deny the motion. Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002) (quoting Anderson, 477 U.S. at 249). Otherwise, the motion should be granted.

### III. Discussion

#### A. Failure to Pay Earned Sick Time (Count III)

Kliskey contends that MOC did not pay her earned sick time for the full duration of her FMLA leave. The Massachusetts Earned Sick Time Law ("MESTL"), Mass. Gen. Laws ch. 149, § 148C, and its enforcing regulations, 940 Mass. Code Regs. § 33.00 et seq., impose obligations on certain employers regarding earned sick time. Covered employees earn sick time at a rate of 1 hour for every 30 hours worked. Mass. Gen. Laws ch. 149, § 148C(d)(1). Once earned, up to 40 hours per year of sick time can be used, id. §§ 148C(d)(4), (6), in increments at least as small as 1 hour, id. § 148C(d)(7). Permissible uses of the time include "care for . . . physical or mental illness, injury, or medical condition that requires home care, professional medical diagnosis or care, or

preventative medical care," as well as "routine medical appointment[s]" and time necessary to "address the psychological, physical or legal effects of domestic violence." Id. § 148C(c). Sick time can be so used not only for the employee himself or herself but also (except for the domestic-violence provision) for the "employee's child, spouse, parent, or parent of a spouse." Id. §§ 148C(c)(1), (3)-(4).

All covered employees have the right to take their earned sick time without fear of consequences at work. Id. § 148C(h); see also id. § 148C(i) (barring employer retaliation for asserting MESTL rights). Employers with 11 or more employees must also provide a minimum of 40 hours of sick time, id. § 148C(d)(4), earned "at the same hourly rate as the employee earns from the employee's employment at the time the employee uses the paid sick time," id. § 148C(a). While these protections are a state-mandated "floor" of protection that an employee always can invoke, MESTL makes clear that an employer remains free to improve on them. Id. § 148C(j). That particular provision provides:

> Nothing in this section shall be construed to discourage employers from adopting or retaining earned sick time policies more generous than policies that comply with the requirements of this section and nothing in this section shall be construed to diminish or impair the obligation of an employer to comply with any contract, collective bargaining agreement, or any employment benefit program or plan in effect on the effective date of this section that provides to employees greater earned sick time rights than the rights established under this section.

Id.

The pertinent regulations issued by the Attorney General provide:

> An employer's own paid time off, vacation, sick leave, or other policy may be substituted for earned sick time so long as 40 hours of time off provided under the policy, or such lesser amount as each employee might earn if the employer were not using the substitute policy, complies with all the provisions of Mass. Gen. Laws ch. 149, § 148C, and 940 Mass. Code Regs. § 33.00, including:
>
> (a) accrual at the rate of no less than one hour for every 30 hours of work;
> (b) pay at the employee's same hourly rate;
> (c) access for all uses authorized under Mass. Gen. Laws ch.149, § 148C;

8

      (d) availability under the same conditions of notice and documentation; and
      (e) extension of the same job protections.

940 Mass. Code Regs. § 33.07(3).

      Kliskey avers that MOC did not pay her sick time for the full duration of her FMLA leave, thereby violating the MESTL. On summary judgment, MOC contends that they are not subject to the obligations set forth in the MESTL because their policy provides benefits in excess of that law. [ECF No. 41 at 3]. In their view, the MESTL and its enforcing regulations only require employers to pay up to 40 hours of earned sick leave, as any benefits granted in excess are outside the purview of the MESTL. MOC arrives to this conclusion by cursorily asserting that: i) the enforcing regulations are silent on the application of MESTL to policies providing more generous benefits than the law; and ii) MESTL expressly provides that it is not intended to "diminish or impair the obligation" of an employer to comply with a contract or employee benefit plan that provides "greater earned sick time rights[.]" [ECF No. 57 at 2]. MOC, however, provides no substantive analysis of the MESTL's text, structure, or purpose to support this conclusion. The mere fact that MOC provides sick leave benefits exceeding MESTL's minimum requirements does not, without a more detailed analysis, establish that such additional benefits are exempt from the law's substantive protections.

      The Court recognizes that there appears to be no binding case law directly interpreting whether MESTL's protections extend beyond the 40-hour minimum when employers provide more generous benefits. The MESTL requires employers to provide a minimum of 40 hours of earned paid sick time per calendar year to eligible employees. Mass. Gen. Laws ch. 149, § 148C(d)(4). The law, however, should not discourage employers from providing more generous policies and diminish obligations, existing at the time MESTL went into effect, to provide greater sick time rights. See Mass. Gen. Laws ch. 149, § 148C(j). The MESTL does not otherwise speak

9

more as to the types of protections employees are entitled to when their employers provide them with policies that are more generous than what the law provides.

Under Massachusetts law, statutory interpretation begins with the plain language of the statute, which is the "principal source of insight into legislative intent." Water Dep't of Fairhaven v. Dep't of Env't Protection, 920 N.E.2d 33, 37 (Mass. 2010); accord Malloch v. Hanover, 37 N.E.3d 1027, 1034 (Mass. 2015). Here, the statute explicitly mandates protections for 40 hours of sick time. While § 148C(j) states that nothing should "discourage" more generous policies or "diminish or impair" greater rights, the statute does not affirmatively extend its protections to hours beyond the statutory minimum. To interpret the statute as automatically extending all its protections to any additional sick time provided would be adding requirements beyond what the plain language of the statute requires. When the statutory language is clear, courts "need not look beyond the words of the statute itself." Doherty v. Civil Serv. Comm'n, 159 N.E.3d 653, 658 (Mass. 2020).[3]

The undisputed facts show that MOC paid the Kliskey at least 40 hours of sick time during her leave, [SOMF ¶ 13], thereby satisfying its obligations under the MESTL. While MOC's policies may have provided for additional sick time benefits, those additional benefits are not automatically subject to MESTL's statutory protections. The statute sets a floor, not a ceiling, for sick leave benefits. Moreover, as explained in further detail infra, the record shows that Kliskey sought to apply for PFML benefits on April 29, 2022. [ECF No. 51-17]. Under Massachusetts law, MOC was therefore prohibited from enforcing its policy requiring employees to exhaust earned

---

[3] Even if we looked outside of the four corners of the statutory language, the Attorney General's regulations provide that an employer's policy may substitute for earned sick time "so long as 40 hours of time off" provided under the policy . . . complies with all the provisions of Mass. Gen. Laws ch. 149, § 148C." 940 Mass. Code Regs. § 33.07(3) (emphasis added). This further evinces the Court's interpretation that the MESTL only sets a floor for sick leave benefits.

sick leave or vacation time. Mass. Gen. Laws ch. 175M, § 2(h)(1)(iii). Accordingly, summary judgment must be granted in MOC's favor as to Count III.

### B. Retaliation Claims (Counts IV-VI)

Kliskey claims that MOC both interfered with her rights (Count IV) and retaliated against her for exercising those rights (Counts V and VI). [ECF No. 1 ¶¶ 41, 47, 51]. Nevertheless, both the interference and retaliation claims arise out of a single set of facts in which "her termination is the adverse action that plaintiff contends constituted both interference with and retaliation against the exercise of her FMLA rights." Chacon v. Brigham & Women's Hosp., 99 F. Supp. 3d 207, 214 (D. Mass. 2015). "[A]n employer who simply blocks an employee from taking leave to which she is entitled has committed non-retaliatory interference with the substantive rights afforded by the FMLA." Id. But where, as here, "an employer who terminates an employee for exercising or attempting to exercise her FMLA rights has committed a retaliatory act of interference that must be evaluated under the retaliation framework." Id. Indeed, Kliskey's claims that MOC did not allow her to use her accrued time, failed to pay her in a timely manner, terminated her health benefits, terminated her, and coerced a resignation from her, are all grounded upon her use of sick leave. As such, Kliskey's interference claims must be reviewed under a retaliation framework. Massachusetts courts typically apply the framework used for retaliation claims under the FMLA.[4] E.g., Corbett v. Mananto Enter., LLC, No. 2280CV00153, 2024 WL 3843145, at *10-11 (Mass. June 5, 2024) ("The court turns to case law under the [FMLA] to assess the plaintiff's [PFML] claims because state courts have not yet had an opportunity to provide guidance on the PFML given its recent enactment.").

---

[4] While the parties' briefing does not cover this point, both apply the FMLA framework in their analyses.

11

The FMLA provides eligible employees with, among other things, the right to take twelve weeks of leave during any twelve-month period because the employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." Germanowski v. Harris, 854 F.3d 68, 72 (1st Cir. 2017) (quoting 29 U.S.C. § 2612(a)(1)(D)). "Upon an employee's return, her employer must reinstate her to the same or an equivalent position, without any loss of accrued seniority." Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 718 (1st Cir. 2014); see 29 U.S.C. § 2614(a)(1). "[T]he FMLA and its accompanying regulations [also] make it unlawful for any employer to, among other things: (1) 'interfere with, restrain, or deny the exercise' of any FMLA right; or (2) retaliate or 'discriminat[e] against employees . . . who have used FMLA leave[.]" Carrero-Ojeda, 755 F.3d at 718 (alterations in original) (citations omitted).

To state a retaliation claim, Kliskey must plausibly plead that "(1) she availed herself of a protected FMLA right; (2) she was 'adversely affected by an employment decision;' and (3) 'there was a causal connection between [her] protected conduct and the adverse employment action.'" Germanowski, 854 F.3d 68 at 73 (alteration in original) (quoting Carrero-Ojeda, 755 F.3d at 719). A plaintiff may establish the causal connection "directly or by inference." Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 332 (1st Cir. 2005). "'[V]ery close' temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection." Germanowski, 854 F.3d at 74 (quoting Sanchez-Rodriguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012)). But temporal proximity alone is insufficient where the "larger picture undercuts any claim of causation." Carrero-Ojeda, 755 F.3d at 720 (quoting Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003)).

### 1. Protected Activity

Turning to the first element of the analysis, it is undisputed that Kliskey engaged in protected activity when she requested and took FMLA leave beginning on March 14, 2022. See Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 113-114 (1st Cir. 2006) (holding that plaintiff must show that she "availed herself of a protected right under the FMLA"). MOC approved Kliskey's request to take 12 weeks of FMLA leave to care for her daughter following a suicide attempt. [SOMF ¶¶ 8-9; ECF No. 42-3]. Her leave was schedule to expire on July 1, 2022. [SOMF ¶ 9].

### 2. Adverse Employment Action

For purposes of a retaliation claim, adverse employment actions are those which "'a reasonable employee would [find to be] materially adverse' in the sense that [they] would dissuade the employee from taking FMLA leave." Bellone v. Southwick-Tolland Reg'l Sch. Dist., 915 F. Supp. 2d 187, 199 (D. Mass. 2013), aff'd, 748 F.3d 418 (1st Cir. 2014) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Kliskey alleges that she suffered several adverse employment actions: (1) the termination of her employment, (2) her coerced resignation, (3) the denial of sick pay during her FMLA leave, and (4) the termination of health benefits during her FMLA leave. [Pl. Resp. SOMF ¶¶ 55-60]. MOC disputes these allegations, asserting that Kliskey voluntarily resigned because she was unable to return to work at the conclusion of her leave. [SOMF ¶¶ 16-18]. Upon a close review, the Court finds that Kliskey's contentions fail as a matter of law.

The record clearly establishes that on June 17, 2022, Kliskey informed MOC that she would be unable to return to work at the conclusion of her FMLA leave on July 1, 2022. Kliskey acknowledges this, stating she told MOC she "was unable to return to work at the conclusion of

13

her leave." [SOMF ¶ 15]. Subsequently, on June 30, 2022, Kliskey submitted a resignation letter stating that "[a]fter careful consideration, I have made the decision to resign" effective June 30, 2022, describing her employment with MOC as a "wonderful experience" and a "sincere pleasure," but explaining that she needed a "couple more months" to be with her daughter. [SOMF ¶ 17]. Kliskey does not dispute this fact, but notes that she "elected to resign instead of being terminated illegally after she was told she would not [be] eligible [for] rehire." [Pl. Resp. SOMF ¶ 17]. Given these undisputed facts, Kliskey's claim that she was terminated or coerced into resigning fails as a matter of law.[5]

When an employee affirmatively states that she cannot return to work at the end of her FMLA leave and subsequently submits a formal resignation letter, it constitutes a voluntary resignation, not a termination or coerced resignation. See Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d 418, 424 (1st Cir. 2014) ("We have held that an employee is not entitled to reinstatement under the FMLA if he is unable to return to work until after the expiration of his leave."); Logie v. Mass. Bay. Transp. Auth., 323 F. Supp. 3d 164, 178 (D. Mass. 2018). Indeed, the FMLA guarantees eligible employees up to twelve weeks of leave in any twelve-month period. 29 U.S.C. § 2612(a)(1). Here, it is undisputed that Kliskey was approved to take twelve weeks of FMLA leave. [SOMF ¶¶ 8-9; ECF No. 42-3]. Because Kliskey was unable to return after the period of leave, she had no right to reinstatement as a matter of law. See Barry v. Wing Memorial Hosp., 142 F. Supp. 2d 161, 165 (D. Mass. 2001) ("[A]n employee has no right to reinstatement if she has not returned to work after her twelve weeks of FMLA leave have ended."). An employer's

---

[5] Kliskey's claim under the PFML fail for similar reasons. While the PFML creates a presumption of retaliation for adverse actions taken within six months of applying for PFML benefits, this presumption only applies to actions "taken by the employer." Mass. Gen. Laws ch. 175M, § 9. Here, the record indicates that Kliskey resigned her position because she would be unable to return at the conclusion of her leave. This voluntary resignation does not constitute an action "taken by the employer."

14

insistence that an employee return to work following the expiration of FMLA leave does not constitute coercion or termination; rather, it reflects the employer's legitimate expectations under the law. See Cormier v. Littlefield, 112 F. Supp. 2d 196, 200 (D. Mass. 2000) ("An employer is not required to hold an employee's position open beyond the 12-week period when that employee is unable to return at its expiration.").

Kliskey contends that she needed additional time beyond her FMLA entitlement, but that she was denied extended sick leave pursuant to MOC's enhanced leave policy. [SAMF ¶¶ 51-53; ECF No. 42-5 at 2]. However, once an employee exhausts their FMLA leave, as was the case here, the employer has no obligation under the statute to extend additional leave, even if the employee remains unable to work.[6] Even if MOC's enhanced leave policy obliged it to provide Kliskey with "one day per month, computed by hours paid," as a benefit in addition to FMLA leave, [ECF No. 51-18 at 1], the FMLA cannot be interpreted to give employees a cause of action to enforce other employment agreements. See Green v. New Balance Athletic Shoe, Inc., 182 F. Supp. 2d 128, 135 (D. Me. 2002) (holding that there is no "cause of action under the FMLA if an employer with a leave policy more generous than the one the FMLA mandates fails to provide an employee with more than twelve weeks of leave"). If Kliskey was improperly denied extended sick leave that MOC's policies otherwise guaranteed, her remedy would not be found under the FMLA. See Homes v. e.spire Comm'cs, 135 F. Supp. 2d 657, 666 (D. Md. 2001) ("The FMLA . . . does not provide a remedy for broken promises or deviation from policy."). Instead, she would need to pursue a claim under state law, such as breach of contract or promissory estoppel, if applicable.

---

[6] Kliskey points to the physician's certification she submitted with her request for FMLA leave, noting that it authorized her to take intermittent leave through March 24, 2023. [SAMF ¶ 53]. Nevertheless, Kliskey had already exhausted her twelve weeks of FMLA leave.

15

E.g., Ferguson v. Host Int'l, Inc., 757 N.E.2d 267, 271-72 (Mass. App. Ct. 2001) (holding that an employee handbook may create an enforceable contract where the terms are clear and definite).[7]

Kliskey also avers that she was denied sick pay during her FMLA leave. However, this contention also fails as a matter of law. The record reveals that Kliskey requested PFML benefits on April 29, 2022. [ECF No. 51-17]. Pursuant to MOC policy, Kliskey was "required to utilize all available paid time off benefits (sick time or vacation time) prior to taking unpaid [FMLA] leave[.]" [ECF No. 42-8 at 3]. But once an employee seeks PFML benefits, an employer is prohibited from compelling an employee to exhaust accrued sick leave. Mass. Gen. Laws ch. 175M, § 2(h)(1)(iii) ("This chapter shall not . . . be construed to allow an employer to compel an employee to exhaust rights to any sick, vacation or personal time prior to or while taking leave under this chapter."); 458 Mass. Code Regs. 2.12(8)(a). Kliskey was thus statutorily prohibited from applying her accrued sick leave. Although the record indicates that Kliskey did not ultimately complete her PFML application process, [ECF No. 57 at 3; ECF No. 51-5 at 163, 167], this does not alter the legal analysis.[8] The statutory prohibition was triggered when Kliskey initially requested the PFML benefits, signaling her intent to pursue that avenue of compensation. MOC was entitled to rely on Kliskey's expressed intention to seek PFML benefits, as evidenced by her request. [ECF No. 51-17]; see Mass. Gen. Laws ch. 175M, § 4(b); 458 Mass. Code Regs. 2.12(8)(b). Moreover, Kliskey's failure to complete the application was entirely within her control, not MOC's. MOC cannot be held liable for Kliskey's choice not to follow through on her PFML application, particularly when MOC appropriately responded to her initial application by

---

[7] To the extent Kliskey contends that MOC failed to provide her with benefits set forth in MOC's policies in violation of state law, those claims are currently not before the Court. [See generally ECF No. 1; ECF No. 51 at 5-12].

[8] Because Kliskey decided to forego her application for PFML benefits, we are not convinced she possessed the right to bring a claim under the PFML.

complying with the statutory prohibition against compelling sick time use. This defeats Kliskey's claim that she was entitled to use accrued sick time during her leave.[9]

Regarding Kliskey's claims that her health benefits were terminated during her FMLA leave, [Pl. Resp. SOMF ¶ 21; SAMF ¶ 58], MOC disputes the allegation, contending that it did not cancel Kliskey's health insurance during her leave, [SOMF ¶ 21]. This is not a material dispute. Kliskey's contention fails as a matter of law because she failed to pay for her health plan premiums, an obligation she bore during her leave. Under the FMLA, employees are required to continue paying their portion of health insurance premiums while on leave. Enforcing regulations provide that "any share of group health plan premiums which had been paid by the employee prior to FMLA leave must continue to be paid by the employee during the FMLA period." 29 C.F.R. § 825.210(a); see id. §§ 825.210(b)-(c) (requiring employee to pay premiums if FMLA leave is substituted paid leave or if FMLA leave is unpaid). Consistent with these regulations, MOC's policy similarly required Kliskey to continue paying her portion of premiums during her leave. [ECF No. 42-8 at 4 ("Failure of the employee to pay his or her share of the health insurance premium may result in loss of coverage. Because FMLA leave is normally unpaid, the employee must make arrangements to continue to make his/her contribution to health and dental coverage and any benefit of which the employee pays 100% during the leave. If the employee is eligible to substitute another type of pay (e.g., earned time) during leave, the Agency will deduct the employee's premium contributions.")]. Kliskey was thus under an obligation to pay for any

---

[9] Kliskey's retaliation claim fails under the MESTL fails for the same reasons. Moreover, employers "who provide their employees paid time off under a paid time off, vacation or other paid leave policy who make available an amount of paid time off sufficient to meet the accrual requirements of [Mass. Gen. Laws ch. 149, § 148C] that may be used for the same purposes and under the same conditions as earned paid sick time under this section are not required . . . to provide additional earned paid sick time." Mass. Gen. Laws. ch. 149, § 148C(k) (emphasis added). It is undisputed that MOC paid Kliskey at least 40 hours of sick time during her leave. [SOMF ¶ 13]. Therefore, MOC satisfied its statutory obligation under the MESTL, and any claim beyond that minimum requirement falls outside the scope of the statute's protections. See supra.

premium payments during her leave. The record demonstrates, and Kliskey does not dispute, that she failed to make the required premium payments [Pl. Resp. SOMF ¶ 21].[10] Even assuming arguendo that Kliskey's health benefits were terminated, it would not rise to the level of an adverse employment action if she failed to make the required premium payments. Critically, "an employer's obligations to maintain health insurance coverage cease under the FMLA if an employee's premium payment is more than 30 days late." 29 C.F.R. § 825.212(a). MOC was therefore entitled to terminate Kliskey's health benefits.

In sum, Kliskey has failed to establish that she suffered an adverse employment action as a matter of law. Her voluntary statement that she could not return to work at the conclusion of her FMLA leave, followed by her formal resignation letter, legally precludes her from claiming that she was subsequently terminated or coerced into resigning. Her claims regarding sick pay and health benefits similarly fail in light of the applicable statutory provisions and her own actions.

### 3. Causal Connection

Even assuming Kliskey's claims successfully presented an adverse employment action, she has failed to demonstrate a genuine dispute of material fact with respect to the causation element—a causal connection between her protected activity and the alleged adverse actions. The undisputed facts show that MOC approved Kliskey's FMLA leave request, [SOMF ¶ 9], and was prepared to have her return to work at the conclusion of her leave. It was Kliskey who informed MOC that she would not be returning at the end of her approved leave period. [SOMF ¶ 15]. It is not retaliatory to insist that someone return to work at the conclusion of their leave and to accept their resignation

---

[10] Although pursuant to MOC policy, MOC would have had to deduct Kliskey's premium contributions from any substitute pay received during leave, the record reveals that Kliskey did not receive substitute pay. Although Kliskey sought to apply for PFML benefits, which would have prohibited MOC from requiring Kliskey to exhaust any paid time off (i.e., earned sick time, vacation), before going on unpaid FMLA leave, Kliskey failed to complete the application process, which meant that her leave was effectively unpaid. As such, Kliskey was required to make any premium payments during her leave.

18

when they decline to do so. Bellone, 748 F.3d at 424; Barry, 142 F. Supp. 2d at 165; Cormier, 112 F. Supp. 2d at 200. Kliskey contends that she was terminated before submitting her resignation letter, noting that when she met with her supervisor, Claritza Soto, Soto told her that she had already been fired. The record reveals, however, that this conversation occurred after Kliskey had already informed MOC she would not be returning at the conclusion of her leave. [SOMF ¶ 15 ("On June 17, 2022 Plaintiff told MOC that she was unable to return to work at the conclusion of her leave."); ECF No. 42-3 at 139:4-23 (testifying that she had a conversation with Soto "on the 31st" "regarding [Kliskey's] resignation from MOC")]. As such, Kliskey could not have been terminated during her leave, let alone be coerced into resigning. See supra.

The Court notes that Kliskey appears to be conflating various employment actions in an attempt to characterize her voluntary resignation as a termination that would entitle her to benefits she could not otherwise receive. The record reveals a chronology at odds with Kliskey's narrative: she informed MOC she could not return to work at the end of her FMLA leave, subsequently submitted a formal resignation letter, and only after these actions claims she was terminated or coerced into resigning. Courts are not required to accept as true a legal conclusion couched as a factual allegation, nor should they credit allegations that are speculative in nature. Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 47 (1st Cir. 2008) ("While it is true that in the summary judgment context all reasonable inferences must be drawn in favor of the non-moving party, the District Court is not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party." (emphasis in original)). Kliskey's attempt to recharacterize her voluntary resignation as an adverse employment action by MOC cannot overcome the evidence in the record.

## IV. Conclusion

For the foregoing reasons, MOC's Motion for Summary Judgment [ECF No. 40] is **GRANTED**.

**SO ORDERED.**

Dated: March 31, 2025                                   */s/ Margaret R. Guzman*
                                                        Margaret R. Guzman
                                                        United States District Judge